DAVID W. RIZK – CABN # 284376
RIZK & SHEARER LLP
466 Geary Street, Suite 201
San Francisco, CA 94102
Telephone: (415) 517-9044
Email: drizk@rs-llp.com

Counsel for Defendant Alfozan

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>ABDULRAHMAN ALFOZAN,<br><br>Defendant. | Case No. 3:26-CR-539 VC (AGT)<br><br>**DEFENDANT'S MOTION FOR RELEASE** |

PLEASE TAKE NOTICE that Defendant Abdulrahman Alfozan hereby moves for release from custody pursuant to the Bail Reform Act, 18 U.S.C. § 3142, and requests a bail hearing be convened at the earliest available date and time. The Motion is based on the Act, the Fifth and Eighth Amendments to the U.S. Constitution, relevant case law and statutes, the memorandum below, and oral argument.

## I. Introduction

Mr. Alfozan respectfully moves for release based on changed circumstances. Thankfully, with the benefit of weeks of government and defense investigation, it has become apparent that this case is not what the government and Court feared it to be at the outset. As the Court will recall, much of the original bail hearing focused on the prospect of more serious charges, including the government's theory that Mr. Alfozan may have been stealing trade secrets from OpenAI for Saudi Arabia. It is now clear those fears were unfounded. By its own counsel's admissions, the government has found no new evidence to support the theory Mr. Alfozan was stealing trade secrets, or to support the speculation that

he was acting as an unregistered foreign agent for Saudi Arabia. There is no proof, and it should be undisputed, that Mr. Alfozan has no special or covert ties to the Saudi government. Indeed, to prove he has nothing to hide, on Tuesday Mr. Alfozan gave the FBI the password to his cellphone because the government admitted it has been locked out of the device due to an accident.

Since the detention hearing occurred, Mr. Alfozan was indicted on the sole charge in the Complaint, for a Wiretap Act violation, 18 U.S.C. § 2511(b)(1), for recording an oral communication. *See* ECF No. 18. The U.S. Sentencing Guidelines range for that offense, for a defendant with no criminal history like Mr. Alfozan, is 0-6 months, or 6-12 months if the government can prove the purpose was for "commercial gain or economic gain." U.S.S.G. § 2H3.1. (So far, there is no such proof.) In other words, the sentencing exposure in this case is so minimal that it could not possibly warrant detention absent fairly extraordinary circumstances. There are none here. Absent greater charges or evidence of any covert tie to the Saudi government, Mr. Alfozan should not be detained on the current record.

Underscoring that Mr. Alfozan is no spy and in fact has deep ties to the community, he does not propose any bail bond be arranged by the Saudi consulate. Instead, this case should be treated like any other one. The defense has proffered four potential sureties to Pretrial Services to sign a substantial bond that can also be secured by $500,000 of Mr. Alfozan's own assets. Each of these sureties is highly qualified. They are Mr. Alfozan's best friends, college classmates, former roommates, and former co-workers. Each is a U.S. Citizen with no criminal record, of course. All of them have lives, careers, and family, rooted firmly in the United States, and mostly here in the Bay Area. None of them lightly undertakes this obligation to the Court, and all of them do so only because they have full trust and confidence that Mr. Alfozan will appear for Court and abide by the release conditions.

Mr. Alfozan's wife and child remain in Saudi Arabia because she was so deeply traumatized by the violent FBI raid that woke her last month and then the firestorm of publicity following the government's false insinuations that her husband was a spy. As the Court is aware, she left the U.S. to comply with the terms of her student visa. Government counsel has candidly informed defense counsel that the government does not suspect her of doing any wrongdoing whatsoever. The government gave her passport back to her to allow her to travel after interviewing her, there is no charge or warrant lodged

against her, and she could return on a tourist visa. However, she is nonetheless too terrified of being detained to travel with her infant child. Instead, Mr. Alfozan's brother has traveled here to support him at the bail hearing. Should the Court release Mr. Alfozan, his wife and child will hopefully return home so that they can continue co-parenting. Finally, in a stroke of good luck, Mr. Alfozan's landlord has agreed to allow him to stay in the family's existing residence in the Bay Area. Mr. Alfozan therefore respectfully requests that the Court issue a $1,000,000 bond, to be secured with $500,000 cash from Mr. Alfozan, and the unsecured joint and several promise of up to $500,000 from three sureties, and any conditions in U.S. Pretrial's report the Court deems appropriate.

## II. Background

### a. Arrest and Initial Bail Hearing

On October 9, 2026, Mr. Alfozan was arrested, his residence was searched, and several electronic devices were seized. He was charged by Complaint with a single count of violating the Wiretap Act, 18 U.S.C. § 2511(1)(b), for allegedly placing a surreptitious recording device in a conference room at his former employer OpenAI's office. ECF No. 1. Mr. Alfozan pleaded not guilty.

Beginning with its initial press release, the government began suggesting that Mr. Alfozan—a Saudi national who is a permanent resident, attended M.I.T., and has resided in the U.S. for the last 15 years—may have been engaged in some form of espionage. For example, the Director of National Intelligence said:

> This serious situation underscores why winning the global super intelligence race is a national security prerogative — and why President Trump's leadership in creating the Super Intelligence Force is so important. I thank Director Patel and our FBI partners for their diligence and swift action. The intelligence community remains committed to safeguarding America's cutting-edge intellectual property from foreign threats.

*See, e.g.,* U.S. Dept. of Justice, Press Release, Oct. 13, 2026 (available online). Weeks later, an anonymous law enforcement official told the *Wall Street Journal* that "[t]he Federal Bureau of Investigation is looking at potentially adding an economic espionage charge against Abdulrahman Alfozan." *See* Lawler and Au-Yeung, *Wall Street Journal,* "FBI Explores Espionage Case Against Saudi OpenAI Suspect," Oct. 24, 2026.

The government expanded on these themes in its written detention motion, arguing that he is a serious flight risk to Saudi Arabia. For example, the government explicitly compared this case to *United States v. Abouammo*, a recent prosecution in this district of Saudi nationals under 18 U.S.C. § 951 (acting as an unregistered agent of a foreign government), ECF No. 12 (Gov't Det. Memo.) at 2 & fn. 1; by repeatedly stating that the alleged conduct "put our national security at risk," *id.* at 4, 8, 11; and by warning ominously that the government's investigation is "ongoing and may result in additional charges." *Id.* at 5, 8. Government counsel then reiterated those warnings at the detention hearing, arguing for example that "the gravamen" of the government's argument concerning risk of flight was "connections to the Saudi government and ties to Saudi Arabia," and warned again that "it's no secret to anyone that there is a potential for additional charges." ECF No. 17 (Oct. 19, 2026 Tr. of Proceedings), at 29-30. Mr. Alfozan's prior counsel's unusual proposal that the Saudi government would sign a bond for him in any dollar prompted the government to argue that a foreign government was prepared to pay "whatever's required to secure the defendant's release." *Id.* at 35. This Court accepted those concerns that the Saudi government might be "protecting their asset" and detained Mr. Alfozan as a flight risk. *Id.* at 17.

**b. Discovery**

Mr. Alfozan's prior defense counsel made a discovery request to the government at the initial appearance on October 13, 2026. Undersigned counsel substituted in after the bail proceedings on Thursday, October 29, 2026, and repeated the request for discovery in writing and indicated a willingness to sign the model protective order immediately. The government sent a modified protective order on Saturday October 31, 2026, and counsel agreed to it on Monday, November 2, 2026, while reserving some objections (see below) in order to facilitate speedy disclosure by the government. The Court signed the protective order the same day it was filed on November 3, 2026. ECF No. 21.

At the defense's request, government counsel agreed to meet and confer on November 3, 2026, regarding the state of discovery. During the call, government counsel acknowledged that the FBI investigation had not uncovered *any* new evidence that would support any additional charges, including either a violation of § 951 for being an unregistered foreign agent, or for any trade secret theft in violation of 18 U.S.C. § 1832. Of course, the government cautioned charges could be brought some time

in the future. But government counsel acknowledged that if there were supporting evidence, new charges would have been brought when Mr. Alfozan was indicted. Instead, Mr. Alfozan was indicted solely on the Wiretap Act count that was the subject of the Complaint. ECF No. 18. Defense counsel declined to waive time when Mr. Alfozan was arraigned on the new Indictment on November 6, 2026, because at that time nearly 30 days into the case the government still had not produced any discovery—and had succeeded in detaining the defendant.

The government eventually made its first production on November 9, 2026. The production includes hundreds of pictures from Mr. Alfozan's residence, some records concerning OpenAI's reports of its investigation into Mr. Alfozan and related OpenAI Codex data, Mr. Alfozan's employment file, roughly 20 pages of FBI reports concerning some contacts with OpenAI and brief interviews with Mr. Alfozan and his wife[1], some photographs and limited surveillance footage, and grand jury subpoena returns consisting of data from financial firms, Google, Apple, among other things.

There is no evidence in the government's first production to support more serious charges. Notably, there is no documentation of any additional government investigation into Mr. Alfozan's alleged ties to the Saudi government; no records or FBI reports for example, concerning a single investigative step the government took to assess whether Mr. Alfozan has had any direct contacts with anyone suspected of espionage or connected to Saudi intelligence services; no evidence the government investigated any of the contacts in Mr. Alfozan's cellphone or other devices; no apparent investigation into whether he received any suspicious payments from Saudi-affiliated sources; no evidence of any illicit or suspicious technical assistance or support from any foreign government, or indeed, anyone else.

There is also no discovery that counsel would expect from the government to support a potential trade secret charge. Forensic images of the devices seized by the government (laptops, cell phones, alleged recording device), and the alleged recordings themselves have not been produced to the defense—and as of this filing the government has not been able to identify or agree to any date by which they will be produced. There are no formal forensic or technical reports concerning any of the devices or recordings, and no FBI reports whatsoever concerning the government's review of recordings, which

[1] Government counsel has repeatedly confirmed that Mr. Alfozan's wife is not accused or suspected of any wrongdoing whatsoever, including when she departed the country after her husband's arrest just before her student visa expired.

government counsel has acknowledged is ongoing. There is also no evidence Mr. Alfozan approached a competitor or had an intent to enrich a third party, or even that the government has conducted any investigation to support such a theory. Although the government has promised to produce FBI reports of interviews with "some potential witnesses," to date, there is no evidence of any significant consultation between the government and OpenAI about the contents of any specific recordings to identify any alleged trade secrets.

Defense counsel again conferred with the government last Friday, November 13, 2026. When asked about any evidence to support more serious charges on Friday, government counsel again candidly acknowledged that no such new evidence has emerged. However, government counsel was unable to answer directly any of defense counsel's questions about documentation or evidence concerning the government's investigation into Mr. Alfozan's suspected ties to the Saudi government, or any trade secret theft. The defense appreciates government counsel's candor concerning the state of the evidence and further charges. Defense counsel has also been direct with the government about the defense's intent to surface the truth expeditiously. For example, during the November 13 meet-and-confer call, the government revealed to defense counsel that the FBI had lost access to Mr. Alfozan's cellphone weeks ago when a power failure at an FBI facility over the weekend following Mr. Alfozan's arrest allowed the cellular device to run out of power and lock. As a signal of transparency and his willingness to cooperate with the government to clear his name, Mr. Alfozan immediately agreed voluntarily to provide the FBI with the code to access to his cellphone and did so on November 17, 2026.

At 8:45 p.m. the night before the district court status hearing, the government made a second production of materials. The second production did not materially alter the record on any of the issues identified above. It included a handful of largely irrelevant FBI reports, mostly related to surveilling the defendant prior to his arrest (*i.e.*, following him around in public), executing the arrest warrant, and seizing items from OpenAI. It also included dozens of photographs of the OpenAI office and of content on Mr. Alfozan's displayed on cellphone.

As for any meaningful investigation into Mr. Alfozan's ties to Saudi Arabia or trade secret theft, there is none. There is no indication that the government has conferred with OpenAI about any specific

trade secret information, or any information from any recordings. There is one FBI report in which agents met with OpenAI's outside counsel two weeks ago to ask whether the company had overproduced data to the government, which counsel denied. Another report indicates prosecutors and agents have walked through the office at OpenAI. Yet another report indicates that the government has confirmed Mr. Alfozan's wife's brother is a member of the Saudi Arabian Navy, and that he purchased her and her son an outbound ticket from San Francisco on October 10, 2026—all of which was previously known. In other words, the FBI has now had many weeks to review reams of data from OpenAI, volumes of grand jury return data including Mr. Alfozan' and his wife's personal email and iCloud files, Mr. Alfozan's family's cellphones, iPad, and laptop devices, the recording devices seized, and hundreds of recordings from the defendant's computer (the vast majority of which apparently contain just random noise and silence), and the government still has not surfaced any additional or new evidence of more serious criminal conduct. That is because there is no such evidence.

During the parties' last meet and confer call, when defense counsel suggested to the government that the evidence here suggests that Mr. Alfozan is an overly curious tinkerer without any more nefarious intentions, government counsel candidly acknowledged that they do not currently have evidence to prove otherwise.

**c. November 17, 2026 District Court Status Hearing**

Defense counsel filed a status report on Monday, November 16, 2026, to alert Judge Chhabria to the issues above. ECF No. 24. Principally, Mr. Alfozan asked the Court to impose swift deadlines on the government to turn over discovery, including evidence that is exculpatory to Mr. Alfozan, given that he has refused to waive time and in view of the government's arguments concerning bail. Citing *Brady v. Maryland*, 373 U.S. 83 (1963) and California Rule of Professional Conduct 3.8, the defense argued that the government cannot have Mr. Alfozan detained on claims about his ties to Saudi Arabia or economic espionage without promptly and fully disclosing all of the relevant evidence to the defense. Judge Chhabria largely agreed with the defense, set a speedy trial for January 20, 2026, and imposed a slew of very aggressive discovery deadlines on the government, which begin to run on Friday, November 20, 2026, and continue next week and throughout December.

At the hearing, under questioning from the Court, government counsel again confirmed that the government had uncovered no evidence to support further charges against Mr. Alfozan.[2] Judge Chhabria also cautioned the government to honor its *Brady* obligations, and urged both parties to return to the magistrate court to ensure that the bail decision was supported by the record. These bail proceedings followed. Undersigned defense counsel has been transparent with the government and Judge Chhabria that if Mr. Alfozan is released, he will agree to vacate the deadlines and waive time. Nevertheless, the government has refused to stipulate to Mr. Alfozan release, despite the circumstances.

## III. Argument

### a. Legal Standard

Prior to a conviction, the Bail Reform Act of 1984 requires a court to release a person charged with an offense pending trial, "unless the judicial officer determines that such release will not reasonably assure the appearance of the person as required or will endanger the safety of any other person or the community." 18 U.S.C. § 3142(b).[3] The government may not seek detention in this case unless it meets § 3142(f)(2) with concrete proof by a preponderance of the evidence to show that the defendant presents a "serious risk of flight." If such a showing is made, the Court must still release the defendant after a hearing if any set of conditions will reasonably ensure his appearance, and impose the "least restrictive further condition, or combination of conditions" necessary to mitigate the risks of nonappearance. 18 U.S.C. § 3142(c)(1)(B). In doing so, the Court may consider the following factors:

> (1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence, a violation of section 1591, a Federal crime of terrorism, or involves a minor victim or a controlled substance, firearm, explosive or destructive device;
>
> (2) the weight of the evidence against the person;
>
> (3) the history characteristics of the person, including (A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and (B) whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law; and

---

[2] Defense counsel respectfully urges the Court to review the transcript of proceedings before Judge Chhabria, and for the reasons set forth therein, requests a bail hearing as soon as possible.

[3] The government has never suggested Mr. Alfozan presents any safety concern and could not credibly do so now.

> (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release.

*See* 18 U.S.C. § 3142(g). "Only in rare circumstances should release be denied, and doubts regarding the propriety of release are to be resolved in favor of the defendant." *United States v. Santos-Flores*, 794 F.3d 1088, 1090 (9th Cir. 2015). The weight of the evidence against the defendant is the least important factor. *See United States v. Hir*, 517 F.3d 1081, 1086 (9th Cir. 2008). "The Fifth and Eighth Amendments' prohibitions of deprivation of liberty without due process and of excessive bail require careful review of pretrial detention orders to ensure that the statutory mandate has been respected." *United States v. Motamedi*, 767 F.2d 1403, 1405 (9th Cir. 1985).

The ultimate burden of persuasion remains with the government to prove by a preponderance of the evidence to the Court that no set of conditions can reasonably ensure the defendant's appearance. *Id.* at 1407. "Section 3142 does not seek ironclad guarantees, and the requirement that the conditions of release 'reasonably assure' a defendant's appearance cannot be read to require guarantees against flight." *United States v. Chen*, 820 F. Supp. 1205, 1208 (N.D. Cal. 1992) (Walker, J.). Courts have interpreted "serious risk of flight" by the term's plain meaning. "Flight" means not non-appearance but intentionally leaving the jurisdiction to avoid prosecution. *United States v. Molina-Orantes*, 798 F. Supp. 3d 1204, 1214 (D. Or. 2025) (citing *United States v. Figueroa-Alvarez*, 681 F. Supp. 1131, 1138 (D. Id. 2023)). "'Serious' has a plain meaning." *Figueroa-Alvarez*, 681 F. Supp. at 1138 (citing *Black's Law Dictionary* definition for "serious" as "important, weighty, momentous, grave, great"); *id.* (citing *United States v. Alvarenga-Canan,* No. 1:23-cr-00042-BLW, March 2, 2023 Hearing Tr. at 45 (Dkt. No. 26) (serious risk of flight is "something more than your garden-variety defendant, a weighty, substantial risk and not inconsequential and not average")). "Taken together, then, a 'serious risk of flight' under § 3142(f)(2)(A) is a great risk—beyond average—that the defendant will intentionally and actively move within or outside the jurisdiction to avoid court proceedings or supervision." *Id.*

The Court is empowered to reopen bail proceedings if "information exists that was not known to the movant at the time of the hearing and that has a material bearing on the issue whether there are conditions of release that will reasonable assure the appearance of such as person as required …." 18 U.S.C. § 3142(f)(2)(A); *Chen*, 820 F. Supp. at 1209 (noting that "[i]n the months since the earlier bail

determinations, this case has taken a number of surprising turns, justifying reconsideration of the pretrial release issue," including the court's suppression of evidence that could be deemed inculpatory and exculpatory, and granting bail to defendants previously detained). Notably, when the government seeks to reopen bail proceedings based on new evidence, the Courts typically require proof that the evidence was not available to the government previously. *See, e.g.*, *United States v. Spring*, 2014 WL 6609156 at *1-2 (D. Mass. Nov. 20, 2014). New proposed bond terms, such as new security or new sureties that are proffered by the defense, are sufficient to meet the standard for reopening under § 3142(f)(2)(A). *See, e.g., United States v. Githens*, 2023 WL 4424555, at *2-4 (E.D. Cal. July 10, 2023) (reopening based on defendant's proposal for "a secured bond based on the real property offered for the Defendant's release and potential new third party custodians").

**b. Mr. Alfozan Does Not Present a "Serious Risk of Flight"**

The defense respectfully submits that the government can no longer meet its burden to show that Mr. Alfozan presents an unusual or particularly grave risk of flight, especially given the mitigating conditions that are proposed here and available to the Court to reasonably assure his appearance.

The changed circumstance here of course is that there is no evidence to support the government's prior suggestion that Mr. Alfozan likely committed a more dangerous, serious, or sophisticated offense than the Wiretap Act recording violation, which is (on the current record) the equivalent of a misdemeanor. If asked directly, counsel for the government will have to acknowledge that the United States of America does not contend Mr. Alfozan is a spy. Previously, the government trumpeted to the Court: "These facts put our national security at risk and heighten the risk the defendant will flee." ECF No. 12 (Gov't Det. Memo.) at 8. But contrary to the speculation at the last bail hearing, there is no evidence to support the suggestion that Mr. Alfozan is an unregistered foreign agent for Saudi Arabia.

There is also no evidence to suggest that he intended to steal or profit from any OpenAI trade secret, as government counsel conceded to Judge Chhabria on Tuesday. At this point, based on the discovery produced to the defense and information from counsel during the parties' meet and confer calls, defense counsel is not even aware of any trade secret that has been identified. Even if one were eventually discerned, for there to be a chargeable federal offense, there would need to be probable cause to show that Mr. Alfozan (1) intended to harm OpenAI and (2) intended to enrich himself or a third

party (among other things). *See* 18 U.S.C. § 1832. Again, it is undisputed that there is no such evidence, and as defense counsel has transparently told the government, there will be no such evidence in this case. That is the reason that Mr. Alfozan voluntarily gave the FBI the code to his iPhone after court on Tuesday. Instead of an economic and foreign espionage case that would be very serious and present real flight risk concerns, what we are left with here is a far less serious recording charge that is frankly more akin to a privacy tort, and very rarely even charged standing alone in federal court.

Obviously, this factual reality has an enormous impact on all of the considerations concerning bail, especially as to flight risk. Looking at the statutory factors under § 3142(g)(1), the actual evidence now completely recasts the nature and circumstances of the alleged offense, and there is little reason for Mr. Alfozan to flee when the charged offense is among the least serious brought in federal court; of course, there is no credible evidence of any weight that he committed a more serious offense, per § 3142(g)(2); his character, family ties, employment, financial resources, and community ties, are also recast entirely by the undisputed fact that Alfozan is no spy and is not accused of any further misdoing, and what we have instead is a healthy, sober, and successful engineer who has no criminal history, and no history of violating court orders, per § 3142(g)(3)(A)-(B). All of the statutory factors now weigh heavily in favor of release.

Without the specter of much more serious charges on the horizon, the available evidence concerning flight risk that was previously seen as suspicious, it is now clear, is in fact entirely innocent. For example: the government cited in its detention motion evidence concerning notes in Mr. Alfozan's cellphone about parental leave and routine tasks, chats with a member of the Saudi royal family (which is estimated to include about 15,000 people), and references to career opportunities in the technology industry in Saudi Arabia, ECF No. 12 (Gov't Det. Memo.) at 5-7. The government has now had over a month to scour Mr. Alfozan's devices and it has turned up nothing to make him out for a spy. None of this material is remotely incriminating, now even the government must admit. The most it shows is a successful Saudi engineer and MIT graduate engaging in normal family and professional life.

Likewise, when Mr. Alfozan availed himself of bail bond support from the Saudi diplomatic mission that is available to all Saudi citizens who are detained abroad, *see* Rizk Decl. ¶ 2, the government argued and the Court appeared to agree that it was an indication that the Saudi government

was willing to sign a "blank check," ECF No. 17 (Oct. 19, 2026 Tr. of Proceedings), at 12-13, 35 (the bond reveals "a willingness on the part of a foreign Government, and one with substantial resources, to pay whatever's required to secure the defendant's release"), or to provide "extraordinary travel assistance," and possibly spirit Mr. Alfozan out of the country. ECF No. 12 (Govt's Det. Memo) at 2 fn.1. In fact, Mr. Alfozan has received no special treatment from the Saudi government because he is just an ordinary Saudi citizen. The defense does not propose to use the Saudi government as a surety, in any case. Instead, Mr. Alfozan proposes to sponsor his release with the typical security that is used in this Court all the time: his own cash constituting a large share of his personal net worth, and a substantial unsecured bond signed by multiple qualified sureties who have known him personally his entire adult life.

Finally, the government and the Court misinterpreted the departure of Mr. Alfozan's wife. The government previously contended that her plane ticket purchases, which were made by the consular staff and her brother, were suspicious. Indeed, government counsel stressed that the wife's initial flight in October was "paid for by the Saudi Government, by the Saudi consulate." ECF No. 17 at 31. Counsel acknowledged nobody at the consulate had been interviewed, but said, "I assume there was some connection, but we don't know precisely why." *Id.* at 32. The government's detention memo went further, arguing that, "the defendant's wife told the FBI agents who interviewed her that [...] she and her son were *permanently* moving back to Saudi Arabia–<u>and that her husband, the defendant, eventually intended to do the same.</u>" *See* ECF 12 at 2 (italics in original; underlining added). The government repeated the point for effect: "She added that her husband planned to return to the United States to resume working at OpenAI after spending two months in Saudi Arabia but that <u>he, too, intended at some point to move to Saudi Arabia permanently to live there with her and their son.</u>" *Id.* at 5 (underlining added).

Following the government's argument, then the Court focused on the same point at the bail hearing, asking repeatedly of defense counsel:

> THE COURT: Right. So the issue is, I think there's a distinction there. The fact is that this time requires a little more scrutiny because the one-way ticket, in light of the open criminal case, takes more import as to maybe this time, as the Government argues, he's not coming back or wasn't intending to come back. And, in fact, doesn't—did the wife tell agents that it was his intention to remain in Saudi Arabia?

DEFENSE COUNSEL: No, Your Honor, he had no intention to remain in Saudi Arabia permanently.

THE COURT: No, maybe not this time, but is her—her statements to the agents were that he intended, at some point, to go to Saudi Arabia and stay there permanently. Did she say that or not?

DEFENSE COUNSEL: Not to my knowledge, based on the indication of her statement. […]

ECF No. 17 at 10-11. In fact, at the time, Mr. Alfozan's defense counsel did not know what exactly she had said because the government had not produced any report or recording or other discovery, despite Mr. Alfozan's pending discovery request.

The FBI report, produced nearly three weeks later on November 9, 2026, does not clearly support the government's characterizations of Mr. Alfozan's "intention" to "permanently" move to Saudia Arabia. *See* Rizk Dec. Ex. A (FBI 302 report). First, the report reflects, Mr. Alfozan's wife makes crystal clear to the agents that he intends to return to the United States to work:

SA Yu: Um, are you moving back to Saudi Arabia?
ALASSAF: Yeah.
[…]
SA Yu: And was he planning on leaving his job there or working remotely?
ALASSAF: He was going to take parental leave for two months as he was...
SA Yu: Ok, and then come back here…
ALASSAF: Yeah.

*Id.* at 1. Here is what the government relies on for the conclusion that Mr. Alfozan "intended" to move "permanently" to Saudi Arabia:

SA Yu: Is the plan for him to come back here and then have a long distance...
ALASSAF: [inaudible]...and then we're going to eventually, all of us, move back.
SA Yu: Oh I see, ok.

*Id.* at 2. No follow up questions were asked. To state the obvious, Mr. Alfozan's wife did not say that her husband "intends to return to Saudi Arabia permanently," or anything nearly so neat and precise. Indeed, she did not say anything about a "permanent" move at all. And in fact, the reality, was more complex. Mr. Alfozan had no intention to move back permanently to Saudi Arabia because of his friends and contacts and career prospects here in the United States. He was in fact in the naturalization process of trying to adjust his status from a legal permanent resident to U.S. Citizen. The family had never decided where they would reside "permanently," and it remained an open issue between the couple. In

the meantime, the interview clearly reflects that Mr. Alfozan was planning on returning to continue working at his lucrative, pre-IPO job at OpenAI—a fact that does not support the conclusion he was intending to flee to Saudia Arabia permanently with the company's recorded secrets. Most of this was lost from the record at the initial bail hearing because the evidence was not disclosed to the defense and the Court was instead left to grapple with the government's self-serving characterizations.

Government counsel has confirmed that, in the course of all of this, Mr. Alfozan's wife did nothing wrong. The evidence to date disclosed by the government indicates she had no knowledge about audio recordings or anything relevant about Mr. Alfozan's work at OpenAI. She voluntarily interviewed with FBI agents for roughly an hour at the time of the initial search and arrest. The government then gave her back her passport and she was permitted to leave, consistent with the requirements of her student visa. Without her cellphone (which had been seized), she reached out to the consulate for assistance. That is not surprising because travel assistance is exactly what consular staff typically provide to citizens abroad in both emergency and routine circumstances—just like they provide citizens detained abroad with access to basic services. In any case, according to government counsel, she should still be able to return to the United States with a valid visa.

None of this comes close to showing that Mr. Alfozan presents a "serious risk of flight," *i.e.*, a "grave" risk of flight that is not "average" but is well beyond typical. Now that it is clear he is not a spy, the Court must confront the question: would it detain an ordinary legal permanent resident who has lived in the United States since attending college, who has no criminal history, many deep friendships, a reputation and a career in the technology industry, all because he was charged with a lesser offense? Mr. Alfozan cannot possibly be considered a serious flight risk merely because he has some Saudi professional ties, and his wife and U.S. Citizen child were forced to temporarily leave the country in order to comply with our immigration law. This leads to the second point.

**c. Alternatively, Conditions Exist to Mitigate Any Risk**

Even if Mr. Alfozan were to present any flight risk, which is not conceded, there are ample conditions that the Court can impose—and must, of course, under the Bail Reform Act—rather than taking the drastic step of detaining him. Mr. Alfozan's contacts and support in the community, which were not fully presented and may have seemed less salient when this appeared to be an espionage case,

are in fact *extensive*. They are more or less what you would expect given that Mr. Alfozan is a fairly typical legal permanent resident who has been living in the United States for his adult life, attended college here, has many friends, and roommates, and co-workers here who care for him, as well as a career that means a great deal to him. That is apparent from his supporters who wrote *en masse* to support his request for bail initially (*see* ECF No. 10-1), and more legally and practically significant for present purposes, it is demonstrated by the potential sureties who were vetted by U.S. Pretrial services to sign an unsecured promissory bond. As noted above, the sureties are all successful, established U.S. Citizens who have known and loved Mr. Alfozan for many years. They would not bet their future and fortunes on an appearance bond for Mr. Alfozan if they were not absolutely certain that he would appear for all hearings and generally comply with the Court's orders.

On top of their word, Mr. Alfozan also proposes to secure his bond with $500,000 of his own funds, drawn from a portfolio of assets that is also held within the jurisdiction of the United States. This is more than enough security to support the bond. This is not a case that threatens him with a severe sentence or penalties, even if all the allegations in the government's Complaint are proven. It does not stand to reason that Mr. Alfozan would rationally choose to flee this case and thereby: (1) sacrifice a majority of his net worth, (2) foreclose ever returning to the United States and travel abroad for the rest of his life, (3) betray his personal sureties and their families, (4) forsake all his American friends and professional contacts, and (5) effectively end his career in the technology industry in Silicon Valley. In addition to these security provisions, the Court of course has the full panoply of release conditions at its disposal: a curfew, GPS location monitoring, home confinement, travel restrictions, supervision and reporting requirements, etc. As Pretrial Services correctly found before the initial bail hearing, there are conditions that may be applied here to more than adequately ensure Mr. Alfozan's personal appearance.

**IV. Conclusion**

For all the reasons, set forth herein, Mr. Alfozan respectfully requests that he be released on the proposed bond and conditions.

//

//

//

November 20, 2026
Date

RIZK & SHEARER LLP

DAVID W. RIZK
Counsel for Mr. Alfozan