CRAIG H. MISSAKIAN (CABN 125202)
United States Attorney

JEFF MITCHELL (CABN 236225)
Chief, Criminal Division

NICHOLAS M. PARKER (CABN 297860)
ERIC CHENG (CABN 274118)
Assistant United States Attorneys

450 Golden Gate Avenue, Box 36055
San Francisco, California 94102-3495
Telephone: (415) 436-7368
nicholas.parker3@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>ABDULRAHMAN ALFOZAN,<br><br>Defendant. | CASE NO. 3:26-CR-00539 VC (AGT)<br><br>**GOVERNMENT'S RESPONSE TO DEFENDANT'S RENEWED MOTION FOR RELEASE**<br><br>Hearing Date: November 24, 2026<br>Hearing Time: 10:00 a.m.<br>Courtroom: A (15th Floor)<br>Judge Hon. Alex G. Tse |

## I. INTRODUCTION

The defendant, Abdulrahman Alfozan, a former engineer at OpenAI, is charged with concealing a sophisticated recording device in an executive conference room at OpenAI to secretly and unlawfully record the oral communications of the persons meeting in that room, in violation of 18 U.S.C. § 2511(1)(b). *See* Dkt. 18 (indictment). In his renewed motion for release (Dkt. 32), the defendant blithely dismisses the seriousness of that charge and appears to presume, without support, that the government's investigation is complete. In fact, however, the government's investigation of this seven-week-old case is ongoing. Thus far, the government has located hundreds of audio files on the defendant's personal computer, including dozens of recordings of meetings or conversations that occurred at OpenAI throughout September 2026,

many of which involve discussions of what may be trade secrets. To be sure, what the defendant did or intended to do with those audio files remains under investigation, but the absence of that evidence *at this point* is not a sufficient change in circumstances warranting the defendant's release from pretrial detention, when the primary question for the Court is whether any condition or combination of conditions will reasonably assure the appearance of the defendant in this Court. On that score, as the government argued in connection with its original motion for detention (*see* Dkt. 12), the defendant is a Saudi national with considerable resources and ties to Saudi Arabia and few remaining ties to the United States. That remains as true now as it was when this issue first came before the Court last month. Nor is it clear from the defendant's renewed motion for release—or from Pretrial Services' addendum report—which, if any, of the defendant's proposed sureties will exert effective moral suasion over defendant, co-sign a surety bond, or even be present in person for the upcoming hearing. On this record, the Court should not disturb its prior order that the defendant be detained pending trial and should deny his renewed motion for release.

## II. PROCEDURAL AND FACTUAL BACKGROUND

The government's prior memorandum in support of detention includes a lengthy recitation of the procedural and factual background as of October 18, 2026. *See* Dkt. 12 at 3–7. Since that date, the government has obtained an indictment (Dkt. 18) charging the same offense alleged in the complaint (Dkt. 1) and made two productions of discovery totaling approximately 1,050 documents and 4,100 pages. Included within those productions were all or nearly all of the materials on which the government relied to seek detention before this Court in October. Pursuant to a recent order from the district court, the government will produce substantially all of the remaining discovery in its possession by November 24, 2026. *See* Dkt. 29. Trial on the sole count in the indictment is currently set for January 2027 and there are additional discovery deadlines falling between now and then. *See id.* However, the defendant has acknowledged that he intends to abandon his demand for a speedy trial if he is released. *See* Dkt. 32 at 8.

Included within the government's forthcoming production will be hundreds of audio files recovered from one of the defendant's personal computers. Among those audio files are dozens of recordings of conversations that took place at OpenAI throughout September 2026, including at least one meeting between OpenAI and representatives of a foreign government, as well as meetings that

occurred on 12 different dates between September 9-28 in the executive conference room where the defendant's surreptitious recording device was later discovered. Many of the recorded meetings involved discussions of what appears likely to be confidential trade secret material (*e.g.*, meetings with OpenAI customers or concerning customer needs and OpenAI capabilities), and others have been identified by OpenAI as containing material protected by attorney-client privilege. The government has also identified dozens of files that appear to be AI-generated transcripts of some of the recordings on the defendant's computer—recordings that, it seems, the defendant meticulously categorized by date and renamed according to the content of the recording. For example, there are audio files called "1301-ai-safety-research-sep22.opus" and "1332-product-activation-sep22.opus" and corresponding transcripts (text files called "1301-ai-safety-research-sep22.md" and "1332-product-activation-sep22.opus") in a folder on the defendant's computer at the following file path: "Local\oai\Sonos\reports\2026-09-22."[1]

Records received from OpenAI show that, in September 2026, the defendant used Codex, an OpenAI productivity agent, to help configure his surreptitious recording device and to transmit and store the audio recordings discussed herein via a cloud-based storage and file-sharing account hosted by Dropbox. For example, on September 27, 2026, the defendant—using his wife's account—prompted Codex to store a passphrase located at the file path "~/Dropbox/Projects/ansible/playbooks/sonos/encrypted-boot/" to the firmware for a XIAO ESP32 device: the same kind of device OpenAI found inserted into a television three days later. *See* US-002843.[2] On September 28, 2026, the defendant received an email with the subject line: "You deleted 5026 files from Dropbox." The following day, the defendant again used his wife's account to prompt Codex "to add voice detection like in [$detect-speech](/Users/alfozan/Library/ CloudStorage/Dropbox/Projects/skills/detect-speech/SKILL.md)," noting that the "goal is to only record speech." *Id.* Later that day, the defendant used his wife's account to prompt Codex to "pick 6 files" and noted that "the audio files are in /Users/alfozan/Local/oai/Sonos/ Sources or in alfozan-mbp-m1 at /Users/alfozan/Library/CloudStorage/Dropbox/Projects/SonosPi/sonos/dat." *Id.*

---

[1] These examples are merely illustrative. There are dozens of additional recordings and transcripts in a total of 15 subfolders organized by date from September 8-28, 2026, at the same general file path. For instance, the recording of the foreign government meeting referenced herein is in the same "2026-09-22" subfolder and is called "1200-sovereign-bilateral-briefing-sep22.opus." It is accompanied by a corresponding transcript file: "1200-sovereign-bilateral-briefing-sep22.md."

[2] The government includes Bates stamped citations herein for the defendant's benefit.

Finally, the defendant's browsing history shows that, on October 5, 2026, he repeatedly visited Dropbox's website to access materials associated with a project called "SonosPi/sonos." US-002848. These records indicate the defendant transmitted the audio recordings through—and/or stored them in—his Dropbox account, in addition to storing at least some of them locally on his personal computer.

The government has also identified a series of photographs on the defendant's cellphone of each page of a printed document, manually capturing by hand what appears to be a term sheet for a "strategic partnership" between OpenAI and another corporate entity. The document is marked as "CONFIDENTIAL" in the upper left corner of the first page and was signed by an OpenAI attorney on August 13, 2026. Metadata from the defendant's cellphone and items visible in some of the photographs suggest the defendant took them at his home in the early morning hours of October 5, 2026—that is, the same day that a hidden camera later caught him looking for his secret recording device in an OpenAI conference room.

Ultimately, evidence developed to date strongly suggests the defendant recorded many meetings that he had no authority to, and did not, attend and that he did so without notice to—let alone authorization from—anyone at OpenAI. And at the same time as he was secretly recording, cataloging, and transcribing dozens of meetings concerning (among other things) OpenAI's partnerships and capabilities, the defendant was in frequent communication with various people affiliated with the Saudi government.

As discussed in the government's prior memorandum, the defendant applied to the Misk 2030 Leaders Program and communicated via WhatsApp with a member of the Saudi Royal Family about AI initiatives in Saudi Arabia. *See* Dkt. 12 at 6. On October 6, 2026, the Saudi Royal Family member sent the defendant a link to a website associated with Echelon, a Riyadh-based AI and technology company that the Saudi official described as "our AI transformation company working with the Kingdom's largest government and enterprise organizations," and asked the defendant: "Time to move back to KSA and join us?" The defendant subsequently suggested he might do so "after the IPO," and his browsing history shows that he visited a website called "Echelon jobs" that same day. *See* US-003964 – US-003965, US-003975. He then received a WhatsApp call from the Saudi official connected to Echelon at about 7:30 pm on October 8, 2026. That call lasted 16 minutes. The defendant also communicated

regularly via WhatsApp with representatives of the Saudi Ministry of Communications and Information Technology (MCIT)—including the Minister himself—in August and September 2026. The defendant also repeatedly visited the websites of the Saudi Ministries of Foreign Affairs (MOFA) and Communications and Information Technology (MCIT) in September and October 2026, and he has contacts in his cellphone for individuals associated with the Saudi Ministry of Investment (MISA). *See, e.g.*, US-002847, US-003381.

As set forth above, the timing of the defendant's communications with Saudi officials in the summer and fall of 2026—and of his planned trip to Saudi Arabia, which was scheduled for October 12, 2026, and before which he prompted Codex to "[f]ind us Saudi shipping deals for boxes" and asked "[h]ow much does it cost to take 5 suit cases on a flight form [*sic*] sfo to Riyadh?," US-002844—appears to match the timing of his efforts to record OpenAI meetings and photograph at least one confidential OpenAI document in September and October 2026.

## III. LEGAL STANDARD

Under the Bail Reform Act of 1984, the Court must detain a defendant before trial without bail where "the judicial officer finds that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person in the community." 18 U.S.C. § 3142(e)(1). Detention is appropriate where a defendant is either a danger to the community or a flight risk; the government need not prove that both factors are present. *See United States v. Motamedi*, 767 F.2d 1403, 1406 (9th Cir. 1985). A finding that a defendant is a danger to the community must be supported by clear and convincing evidence, but a finding that a defendant is a flight risk need only be supported by a preponderance of the evidence. *See id.*; *United States v. Aitken*, 898 F.2d 104, 107 (9th Cir. 1990); *United States v. Winsor*, 785 F.2d 755, 757 (9th Cir. 1986). To support pretrial detention based on risk of flight, the government "must demonstrate that it is more likely than not that there is a serious *risk* that the defendant will flee, not that it is more likely than not that the defendant *will* flee." *United States v. Figueroa-Alvarez*, 681 F. Supp. 3d 1131, 1138-39 (D. Idaho 2023).

The Court must consider the following factors in its detention analysis: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the defendant; (3) the history and characteristics of the defendant, including among other things the defendant's family and

community ties; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release. *See* 18 U.S.C. § 3142(g); *Winsor*, 785 F.2d at 757.

Evidentiary rules do not apply at detention hearings, and the government is entitled to present evidence by way of proffer, among other means. *See* 18 U.S.C. § 3142(f)(2); *Reem v. Hennessy*, 2018 WL 1258137, at *2 (N.D. Cal. Mar. 12, 2018); *see also United States v. LaFontaine*, 210 F.3d 125, 130-31 (2d Cir. 2000) (holding that the government is entitled to proceed by proffer in detention hearings). This is so because bail hearings are "typically informal affairs, not substitutes for trial or discovery." *LaFontaine*, 210 F.3d at 131 (internal quotation marks omitted).

## IV. <u>ARGUMENT</u>

In October, the government argued that the defendant should be detained primarily as a risk of flight given his few remaining ties to the United States and his extensive ties to Saudi Arabia. *See* Dkt. 12 at 4–7, 10. Of course, that was also the reasoning behind the Court's order detaining the defendant. *See* Dkt. 16. Little of consequence has changed since then. "The defendant's wife, infant son, parents, and siblings [still] reside in Saudi Arabia," just as they did last month. Dkt. 16 at 2. The defendant remains terminated from OpenAI and his employment prospects in the United States remain, at best, uncertain in light of the ongoing criminal case. The defendant still has particularly strong ties to Saudi Arabia—not just personally, but also professionally, as set forth in the government's prior memorandum and expounded upon herein—which create an incentive for him to abandon the United States and rejoin his family to start anew in Saudi Arabia. Furthermore, although the Saudi consulate is no longer part of the defendant's proposed bond package, the significance of its prior offer is unchanged: simply put, the Saudi government took a significant interest in the defendant being released.

The defendant's renewed motion for release presupposes—and, indeed, rests extensively on his assertion—that the existing charge in the indictment is "the equivalent of a misdemeanor." Dkt. 32 at 10. The defendant does not explain why he believes the crime with which he is charged, which carries a statutory maximum sentence of five years upon conviction, is "the equivalent of a misdemeanor." Perhaps it relates to his determination that his advisory sentencing range on the Wiretap Act offense would be low. *See* Dkt. 32 at 2. Whatever the merit of his preliminary Guidelines calculation—which the government disputes given the uncertain applicability of several enhancements, *see, e.g.*, U.S.S.G.

§§ 2H3.1(b)(1)(B), 3B1.3, 3C1.1—the defendant's dismissive attitude toward the seriousness of the crime with which he is charged is irrelevant to the bail inquiry. What matters for present purposes is that the defendant is disincentivized to stay in the United States to see this case through—equally now as he was last month. The Court should continue to detain him pending trial to ensure that he does.

## V. <u>CONCLUSION</u>

The defendant presents a serious risk of flight that no set of release conditions can reasonably mitigate. The defendant has every incentive to flee. He faces prison time in the United States. His wife and son are now in Saudi Arabia and have no plans to return, despite prior assurances to the contrary. He has the resources to flee. He has the connections needed not only to flee, but to build a new life in Saudi Arabia. The Court should order the defendant detained pending trial.

## VI. <u>CONDITIONS IN THE ALTERNATIVE</u>

Alternatively, should the Court finds that release is appropriate (it should not, for the reasons set forth above), the government respectfully requests that the Court impose stringent release conditions, including (i) a significant secured bond given the considerable resources available to the defendant, (ii) the conditions recommended by Pretrial Services—including, among other things, a travel restriction and location monitoring—and (iii) a condition barring the defendant not only from contacting OpenAI personnel, but also from accessing or transmitting any OpenAI materials. The government seeks this condition due to a specific concern that the defendant may still have access via one or more cloud-based storage platforms over which he exercises control to confidential OpenAI materials and other sensitive OpenAI information, including the audio recordings discussed herein.

DATED: November 23, 2026

Respectfully submitted,

CRAIG H. MISSAKIAN
United States Attorney

*/s/ Nicholas M. Parker*
NICHOLAS M. PARKER
ERIC CHENG
Assistant United States Attorneys