CRAIG H. MISSAKIAN (CABN 125202)
United States Attorney

JEFF MITCHELL (CABN 236225)
Chief, Criminal Division

NICHOLAS M. PARKER (CABN 297860)
ERIC CHENG (CABN 274118)
Assistant United States Attorneys

450 Golden Gate Avenue, Box 36055
San Francisco, California 94102-3495
Telephone: (415) 436-7368
nicholas.parker3@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>ABDULRAHMAN ALFOZAN,<br><br>Defendant. | CASE NO. 3:26-CR-00539 VC (AGT)<br><br>**GOVERNMENT'S MOTION TO REVOKE RELEASE ORDER AND TO STAY RELEASE**<br><br>Hearing Date: November 30, 2026<br>Hearing Time: 1:00 p.m.<br>Courtroom: 3 (17th Floor)<br>Judge Hon. Vince Chhabria |

**PLEASE TAKE NOTICE** that, on November 30, 2026, at 1:00 p.m., or as soon thereafter as the matter may be heard, the United States will and hereby does appeal the magistrate judge's order releasing the defendant pending trial in this matter, which order was issued on November 24, 2026, and moves this Court for entry of an order revoking the magistrate court's release order. *See* 18 U.S.C. § 3145. The magistrate judge's release order directs that the defendant be released from custody at 8:00 a.m. on November 25, 2026. If the Court cannot hear this motion before that time, the United States further moves this Court to stay the magistrate judge's release order until such time as this motion may be heard.

## I. INTRODUCTION

The defendant, Abdulrahman Alfozan, is a former engineer at OpenAI charged with concealing a sophisticated recording device in an executive conference room at OpenAI to secretly and unlawfully

record the oral communications of the persons meeting in that room, in violation of 18 U.S.C. § 2511(1)(b). *See* Dkt. 18. In a renewed motion for release filed last week (Dkt. 32), the defendant blithely dismissed the seriousness of that charge and appeared to presume, without support, that the government's investigation of this case is complete. In fact, however, the government's investigation of this seven-week-old case is ongoing. Thus far, the government has located hundreds of audio files on the defendant's personal computer, including dozens of recordings of meetings or conversations that occurred at OpenAI throughout September 2026, at least one of which involved representatives of a foreign government and many of which involved discussions of what may be trade secrets. To be sure, what the defendant did or intended to do with those audio files remains under investigation, but the absence of that evidence *at this point* has no bearing on whether the defendant is such a serious flight risk that no condition or combination of conditions will reasonably assure his appearance in this Court. On that score, as the government argued in connection with its original motion for detention (*see* Dkt. 12) and its response to the defendant's renewed motion for release (*see* Dkt. 33), the defendant is a Saudi national with considerable resources and ties to Saudi Arabia and few remaining ties to the United States. On this record, the Court should revoke the magistrate court's release order and order the defendant detained pending trial.

## II. STANDARD OF REVIEW AND APPLICABLE LAW

On appeal of a magistrate judge's release order, this Court "should review the evidence before the magistrate and make its own independent determination whether the magistrate's findings are correct, with no deference." *United States v. Koenig*, 912 F.2d 1190, 1193 (9th Cir. 1990). The record is not limited to those facts that were presented to the magistrate judge; rather, the Court should "make its own 'de novo' determination of the facts," and the "ultimate determination of the propriety of detention is also to be decided without deference to the magistrate's ultimate conclusion." *Id.* at 1193.

Under the Bail Reform Act of 1984, a court must detain a defendant before trial without bail where, as relevant here, "the judicial officer finds that no condition or combination of conditions will reasonably assure the appearance of the person as required." 18 U.S.C. § 3142(e)(1). A finding that a defendant is a flight risk need only be supported by a preponderance of the evidence. *See United States v. Motamedi*, 767 F.2d 1403, 1406 (9th Cir. 1985). To support pretrial detention based on risk of flight, the government "must demonstrate that it is more likely than not that there is a serious *risk* that the

defendant will flee, not that it is more likely than not that the defendant *will* flee." *United States v. Figueroa-Alvarez*, 681 F. Supp. 3d 1131, 1138-39 (D. Idaho 2023).

Courts must consider the following factors in a detention analysis: (1) nature and circumstances of the offense charged; (2) weight of the evidence against the defendant; (3) history and characteristics of the defendant, including family and community ties; and (4) nature and seriousness of the danger to any person or the community that would be posed by the defendant's release. *See* 18 U.S.C. § 3142(g); *United States v. Winsor*, 785 F.2d 755, 757 (9th Cir. 1986). The government bears the burden of proof prior to trial, *see United States v. Hir*, 517 F.3d 1081, 1096 (9th Cir. 2008), but the evidentiary rules are relaxed in detention proceedings, *see* 18 U.S.C. § 3142(f)(2)(B).

## III. DETENTION PROCEEDINGS

The defendant was arrested on October 9, 2026, and made his initial appearance on October 13, 2026. The government moved for a detention hearing at that time due to "a serious risk that [the defendant] will flee." 18 U.S.C. § 3142(f)(2)(a). The magistrate judge granted the government's request and set a detention hearing for October 19, 2026. On that date, the magistrate court considered briefing and heard arguments from the parties. *See* Dkts. 10, 12. After a lengthy hearing, the magistrate judge ordered the defendant detained and issued a written order with the following findings:

> The defendant, who was employed as an engineer at OpenAI, is a Saudi national who held a one-way plane ticket from San Francisco to Saudi Arabia at the time of his arrest. The defendant was fired after being arrested and no longer has a job in the United States. He has few remaining ties to this country and significant ties to Saudi Arabia. He and his family also appear to have considerable engagement with, and support from, the Saudi government, which booked and paid for a one-way ticket for the defendant's wife and son to leave the United States after the defendant was arrested and offered in advance of the detention hearing to 'cover the full amount of the bail bond required for the release of [its] citizen,' the defendant. The defendant's wife, infant son, parents, and siblings now reside in Saudi Arabia. The Saudi government's offer to pay an indeterminate and possibly limitless sum to secure the defendant's release from custody does not assure the Court that it will exercise moral suasion over the defendant to keep him in the United States.

Dkt. 16 at 2 (citation omitted) (alteration in original).

On November 20, 2026, three days after his first appearance in this Court, the defendant filed a renewed motion for release, in which he asserted, among other things, that "this case is not what the government … feared it to be at the outset" and that "the government has found no new evidence to support the theory [that the defendant] was stealing trade secrets." Dkt. 32. The government filed a

response to the defendant's motion rebutting some of his sweeping claims, *see* Dkt. 33, and the magistrate court held a hearing on the defendant's renewed motion on November 24, 2026. Ultimately, the magistrate judge found that, with the Saudi consulate no longer a part of the defendant's proposed bond package and with some of the defendant's friends in its place, release on conditions was appropriate. The magistrate court then issued an order directing that the defendant be released at 8:00 a.m. on November 25, 2026, on conditions including a secured bond and location monitoring.

Given the significant risk that the defendant will flee to Saudi Arabia if he is released from custody—a risk informed by, among other things, the defendant's ample resources, significant family and professional ties to Saudi Arabia, and few remaining ties to the United States—the government submits that even the release conditions imposed by the magistrate court are insufficient to safeguard the defendant's appearance for future proceedings in this case. For that reason, the government asks this Court to revoke the magistrate court's release order and to stay that order until it rules on this motion.

## IV. RELEVANT FACTS AND ARGUMENT

### A. The Defendant's Background and Conduct

The defendant is a Saudi national who at the time of his arrest resided in Millbrae, California, with his wife and their three-month-old baby. The defendant became a legal permanent resident of the United States in September 2020 and has applied to become a naturalized U.S. citizen. His wife, on the other hand, was lawfully present in the United States on an F1 non-immigrant student visa, which expired last month. The defendant received technical degrees at MIT and UC Berkeley and spent about a decade in the high-technology industry around the San Francisco Bay Area, joining OpenAI as an engineer in or around July 2025 with an annual base salary of $325,000 (later increased to $385,000) and a new hire equity grant of $2,200,000 in profit participation units.

The defendant had been scheduled to take two months of parental leave from OpenAI starting in October 2026, and he and his family were booked on a one-way flight to Saudi Arabia on October 12, 2026. Beginning no later than September 8, 2026, the defendant recorded dozens of meetings and other conversations at OpenAI, including by inserting a surreptitious audio recording device into a USB port on the back of a television in an executive OpenAI conference room.[1] The defendant had modified that

[1] OpenAI security personnel found a second, similar recording device in a messenger bag the

device to prevent data transfer between it and the television into which it was inserted. He had also encrypted the content stored on the device's microSD card and, in the days preceding installation of the device, used his wife's OpenAI account to research (among other things) how to "build a continuous audio recorder" to "captur[e] microphone audio and save compressed WAV recordings to an SD card"; "improve audio and live listening"; "develop … speech-triggered recording"; "add browser access and controls," including "live listening"; and "encrypt the SD card" and "decrypt[] and recover[] recordings from the removed card." Dkt. 1 (complaint) at ¶¶ 11–18.

The defendant had also researched in advance where precisely he should install his customized listening device. In August and September 2026, the defendant (i) used an OpenAI productivity agent to ascertain which "meeting rooms" OpenAI "leadership and exec[utives]" used, and where they met with "external partners"; and (ii) spent considerable time near the executive conference room where he later installed the device. Dkt. 1 at ¶¶ 14–16.[2] In fact, and as known to the defendant, the conference room in which the defendant installed the device is typically used for internal OpenAI leadership meetings and technical and product sessions, as well as external briefings with government officials and business counterparts. *See* Dkt. 1 at ¶ 9. Meetings in that room, which the defendant had no authority to participate in, frequently involve discussions of highly confidential technical, commercial, and strategic information, including proprietary research, as well as nonpublic information about OpenAI's technical progress and strategic decisions, capabilities, priorities, government engagements, and commercial relationships. *See* Dkt. 1 at ¶ 10.

**B. Evidence Found on the Defendant's Devices**

To date, the government has recovered hundreds of audio files from one of the defendant's personal computers. Among those audio files are dozens of recordings of meetings or conversations that took place at OpenAI throughout September 2026, including at least one meeting between OpenAI and representatives of a foreign government, as well as meetings that occurred on 12 different dates between

---

defendant left unattended in a printer room near his workspace at OpenAI on October 5, 2026.

[2] In addition, between September 22-28, 2026, the defendant used his cellphone to take photographs of numerous locations within OpenAI, including a second conference room where sensitive meetings often occurred. Moreover, FBI agents who searched the defendant's residence found several electronic components similar to those in the customized devices the defendant had installed in the OpenAI conference room and had in his messenger bag.

September 9-28 in the executive conference room where the defendant's surreptitious recording device was later discovered. Many of the recorded meetings involved discussions of what appears likely to be confidential trade secret material (*e.g.*, meetings with OpenAI customers or concerning customer needs and OpenAI capabilities), and others have been identified by OpenAI as containing material protected by attorney-client privilege. The government has also identified dozens of files that appear to be AI-generated transcripts of some of the recordings on the defendant's computer—recordings that, it seems, the defendant meticulously categorized by date and renamed according to the content of the recording. For example, there are audio files called "1301-ai-safety-research-sep22.opus" and "1332-product-activation-sep22.opus" and corresponding transcripts (text files called "1301-ai-safety-research-sep22.md" and "1332-product-activation-sep22.opus") in a folder on the defendant's computer at the following file path: "Local\oai\Sonos\reports\2026-09-22."[3]

Records received from OpenAI show that, in September 2026, the defendant used Codex, an OpenAI productivity agent, to help configure his surreptitious recording device and to transmit and store the audio recordings discussed herein via a cloud-based storage and file-sharing account hosted by Dropbox. For example, on September 27, 2026, the defendant (using his wife's account) prompted Codex to store a passphrase located at the file path "~/Dropbox/Projects/ansible/playbooks/sonos/ encrypted-boot/" to the firmware for a XIAO ESP32 device—the same kind of device OpenAI personnel found inserted into a television three days later. On September 28, 2026, the defendant received an email with the subject line: "You deleted 5026 files from Dropbox." The following day, he again used his wife's account to prompt Codex "to add voice detection like in [$detect-speech] (/Users/alfozan/Library/ CloudStorage/Dropbox/Projects/skills/detect-speech/SKILL.md)," noting that the "goal is to only record speech." Later that day, the defendant used his wife's account to prompt Codex to "pick 6 files" and noted that "the audio files are in /Users/alfozan/Local/oai/Sonos/ Sources or in alfozan-mbp-m1 at /Users/alfozan/Library/CloudStorage/Dropbox/Projects/SonosPi/sonos/dat." Finally, the defendant's

[3] These examples are merely illustrative. There are dozens of additional recordings and transcripts in a total of 15 subfolders organized by date from September 8-28, 2026, at the same general file path. For instance, the recording of the foreign government meeting referenced herein is in the same "2026-09-22" subfolder and is called "1200-sovereign-bilateral-briefing-sep22.opus." It is accompanied by a corresponding transcript file: "1200-sovereign-bilateral-briefing-sep22.md."

browsing history shows that, on October 5, 2026, he repeatedly visited Dropbox's website to access materials associated with a project called "SonosPi/sonos." These records indicate the defendant transmitted the audio recordings through—and/or stored them in—his Dropbox account, in addition to storing at least some of them locally on his personal computer. Ultimately, evidence developed to date strongly suggests the defendant recorded many meetings that he had no authority to, and did not, attend and that he did so without notice to—let alone authorization from—anyone at OpenAI.

The government has also identified a series of photographs on the defendant's cellphone of each page of a printed document, manually capturing by hand what appears to be a term sheet for a "strategic partnership" between OpenAI and another corporate entity. The document is marked "CONFIDENTIAL" in the upper left corner of the first page and was signed by an OpenAI attorney on August 13, 2026. Metadata from the defendant's cellphone and items visible in some of the photographs suggest the defendant took them at his home in the early morning hours of October 5, 2026—the same day a hidden camera later caught him looking for his secret recording device in an OpenAI conference room.

**C. The Defendant's Foreign Ties**

And at the same time as he was secretly recording, cataloging, and transcribing dozens of meetings concerning (among other things) OpenAI's partnerships and capabilities, the defendant was in frequent communication with various people affiliated with the Saudi government:

- He had applied to the Misk Foundation's "2030 Leaders" program,[4] which would have required his in-person participation in Riyadh.
- He had communicated extensively via WhatsApp with a member of the Saudi Royal Family about AI initiatives in Saudi Arabia, including as recently as the night before he was arrested. In May 2026, the Saudi official told the defendant, "Saudi needs you more then [*sic*] the US!" to which the defendant responded "100," indicating he agreed. On October 6, 2026, the Saudi official sent the defendant a link to a website associated with Echelon, a Riyadh-based

[4] According to its website, the Mohammed bin Salman (Misk) Foundation's "2030 Leaders" program "is an exclusive world-class leadership development program that will transform exceptional senior Saudi leaders to change history and achieve our one common goal - realizing Saudi's Vision." *See* https://misk.org.sa/leaders2030/#about (last visited Oct. 17, 2026). The program is open only to Saudi nationals 45 or younger who are "[p]roficient in spoken and written English." *Id.*

AI and technology company the Saudi official described as "our AI transformation company working with the Kingdom's largest government and enterprise organizations," and asked the defendant: "Time to move back to KSA and join us?" The defendant subsequently suggested he might do so "after the IPO," and his browsing history shows that he visited a website called "Echelon jobs" that same day. He then received a WhatsApp call from the Saudi official connected to Echelon at about 7:30 pm on October 8, 2026. That call lasted 16 minutes.

- He communicated regularly via WhatsApp with representatives of the Saudi Ministry of Communications and Information Technology (MCIT)—including the Minister himself—in August and September 2026.
- He repeatedly visited the websites of the Saudi Ministries of Foreign Affairs (MOFA) and Communications and Information Technology (MCIT) in September and October 2026, and he has contacts in his cellphone for individuals associated with the Saudi Ministry of Investment (MISA).

As set forth above, the timing of the defendant's communications with Saudi officials in the summer and fall of 2026—and of his planned trip to Saudi Arabia, which was scheduled for October 12, 2026—appears to match the timing of his efforts to record OpenAI meetings and photograph at least one confidential OpenAI document in September and October 2026. Moreover, the defendant's entire family now resides in Saudi Arabia: not only his wife and infant son (who ultimately flew from SFO to Doha, Qatar on October 10, 2026, on a one-way, business-class ticket booked and paid for by a Saudi military official), but also his parents and siblings.

**D. The Statutory Factors Weigh in Favor of Detention**

1. <u>Nature and Circumstances of the Offense Charged</u>

The first factor in the Court's detention analysis contemplates consideration of the specific acts and charges alleged *and* the potential penalty if the person is convicted. *See, e.g.*, *United States v. Hir*, 517 F.3d 1081, 1086 (9th Cir. 2008); *United States v. Townsend*, 897 F.2d 989, 995 (9th Cir. 1990).

Here, the nature and circumstances of the offense are serious, notwithstanding the defendant's assertions to the contrary. The defendant went to significant lengths to create customized, encrypted recording devices to secretly record highly sensitive meetings involving senior OpenAI personnel and

executives, high-level business counterparts, and government officials, all while communicating with individuals of significance in Saudi Arabia and pursuing opportunities in—and making plans to travel to—Saudi Arabia. Moreover, the five-year prison sentence the defendant faces if he is convicted on the charged offense represents a significant custodial term for someone who, like the defendant, has never before been prosecuted, let alone incarcerated, and provides yet another incentive for the defendant to flee the United States rather than see this case to its conclusion. *See Townsend*, 897 F.2d at 995.

2. Weight of the Evidence Against the Defendant

As described herein, the weight of the evidence against the defendant is significant, creating "a considerable incentive to flee." *United States v. Millan*, 4 F.3d 1038, 1046 (2d Cir. 1993); *see also Motamedi*, 767 F.2d at 1408; *United States v. Palmer-Contreras*, 835 F.2d 15, 18 (1st Cir. 1987) (where "the evidence against defendants is strong, the incentive for relocation is increased").

The defendant's Codex prompts show he researched how to build a surreptitious audio recording device; how to modify it to prevent data transfer, develop speech-triggered recording, improve live-listening capabilities, save compressed WAV files to a built-in microSD card, and add remote-access controls; and how to encrypt and decrypt it so only he could access its contents. His Codex prompts and photos on his phone of OpenAI locations show he researched where he should install his customized listening device, focusing on meeting rooms that would involve sensitive and confidential discussions between and among OpenAI executives, government officials, and business counterparts regarding, among other things, commercial relationships and priorities, strategic decision making, and OpenAI's proprietary technologies and capabilities. He was then captured on video looking for his recording device. Finally, after arresting the defendant, FBI agents found (i) in the defendant's home, electronic component parts similar to those in the customized devices he installed and possessed at OpenAI; and (ii) on the defendant's computer, dozens of recordings of meetings or conversations that occurred at OpenAI throughout September 2026.

3. History and Characteristics of the Defendant

The defendant is a Saudi national whose wife, son, parents, and siblings reside in Saudi Arabia. He regularly travels to Saudi Arabia (among other places) for both business and pleasure. He has considerable resources in U.S. bank accounts and an unknown sum in at least two Saudi bank accounts.

He no longer has a job in, or meaningful ties to, the United States, but he has deep professional ties to, and extensive business contacts in, Saudi Arabia.

## V. CONCLUSION

Last month, the magistrate court detained the defendant as a flight risk given his "few remaining ties to this country and significant ties to Saudi Arabia." Dkt. 16 at 2. Little of consequence has changed since then. The defendant's wife, infant son, parents, and siblings still reside in Saudi Arabia. The defendant has no job and his employment prospects in the United States remain, at best, uncertain in light of the ongoing criminal case. The defendant still has particularly strong ties to Saudi Arabia—not just personally, but also professionally—which create an incentive for him to abandon the United States (and this case) and rejoin his family to start anew in Saudi Arabia. Furthermore, although the Saudi consulate is no longer part of the defendant's proposed bond package, the import of its prior offer is unchanged: simply put, the Saudi government took such a significant interest in this defendant that it was willing to post whatever bond was required to secure his release.

Ultimately, the defendant's dismissive attitude toward the seriousness of the crime with which he is charged is irrelevant to the bail inquiry. What matters for present purposes is that the defendant is disincentivized to stay in the United States to see this case through—equally now as he was when the magistrate court initially ordered him detained. He presents a serious risk of flight that no set of release conditions can reasonably mitigate. The Court should revoke the magistrate judge's release order and order the defendant detained pending trial.

DATED: November 25, 2026

Respectfully submitted,

CRAIG H. MISSAKIAN
United States Attorney

*/s/ Nicholas M. Parker*
NICHOLAS M. PARKER
ERIC CHENG
Assistant United States Attorneys